# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 18, 2022 Session

## BARRY VAULTON, ET AL. v. POLARIS INDUSTRIES, INC., ET AL.

### Appeal from the Circuit Court for Jefferson County
### No. 25442-IV      O. Duane Slone, Judge

_____

### No. E2021-00489-COA-R3-CV

_____

This appeal concerns an ATV (all-terrain vehicle) accident. Sam Vaulton, a minor, by his parents, next friends and natural guardians, Barry Vaulton and Joy Vaulton, and Barry Vaulton and Joy Vaulton, individually ("Plaintiffs," collectively) sued Polaris Industries, Inc. ("Polaris") and Ritchie Power Sports, LLC ("Ritchie") ("Defendants," collectively) in the Circuit Court for Jefferson County ("the Trial Court") for injuries Sam Vaulton received from the winch on his ATV (called "The General"). The General was manufactured by Polaris and sold by Ritchie. Sam Vaulton lost his right index finger when he directed his friend to push the "out" button on the winch-controls while Sam Vaulton was holding the winch-hook and the cable went in rather than out. Defendants filed motions for summary judgment, which the Trial Court granted. Plaintiffs appeal. We affirm the Trial Court's conclusion that there is no genuine issue of material fact as to whether Plaintiffs were provided an owner's manual or safety instructions; the undisputed evidence shows they were provided. However, there are genuine issues of material fact as to whether a tether was attached to the winch-hook and whether the General's winch was in a defective or unreasonably dangerous condition when it left Polaris' control. We hold further that the Trial Court erred in concluding at this summary judgment stage that Polaris had no duty to attach a rubber stopper to the winch. We, therefore, reverse the Trial Court's grant of summary judgment to Defendants, and remand for further proceedings consistent with this Opinion. The judgment of the Trial Court is thus affirmed, in part, and reversed, in part.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed, in Part, and Reversed, in Part; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Christopher T. Cain, Knoxville, Tennessee, for the appellants, Samuel Denver Vaulton, a minor, by his parents, next friends and natural guardians, Barry Vaulton and Joy Vaulton, and Barry Vaulton and Joy Vaulton, individually.

William R. Johnson and Shane Mayes, Marietta, Georgia, for the appellee, Polaris Industries, Inc.

Joshua G. Offutt and Lucas E.W. Jerkins, Nashville, Tennessee, for the appellee, Ritchie Power Sports, LLC.

## OPINION

## Background

On March 7, 2018, Plaintiffs sued Defendants in the Trial Court. Plaintiffs alleged that on March 7, 2017, Sam—then age 14—suffered "the traumatic amputation of his index finger at the proximal inter-phalangeal joint of his dominant right hand" because the General's "defective and unreasonably dangerous winch system" pulled his finger off. The General is a 2017 Polaris General 1000 ATV. Polaris manufactured the General. Ritchie sold the General to Plaintiffs in November 2016. In their complaint, Plaintiffs alleged that "[t]he accident was the sole and proximate result of the negligence, failure to warn, and the manufacture and sale of a defective and unreasonably dangerous product, and breach of warranties both express and implied, by the Defendants." Plaintiffs asserted claims of negligence, breach of warranties, and strict liability against Defendants. Ritchie and Polaris each filed an answer denying liability, with Polaris asserting available defenses under the Tennessee Products Liability Act, Tenn. Code Ann. §§ 29-28-101 to -108 ("the TPLA"). Discovery ensued. In March 2020, Ritchie filed a motion for summary judgment. In May 2020, Polaris filed its own motion for summary judgment. Plaintiffs filed responses to each motion. In September 2020, Polaris filed three affidavits, various deposition transcripts, and videotape footage of a July 2019 inspection of the General.

In his deposition, Sam Vaulton described the run-up to his accident as well as the accident itself as follows:

Q. Did you ever talk about how [the winch] should be used between November of 2016 and the date of the incident?
A. No, sir.
Q. Did you ever read any instructions or warning manuals?
A. We never got a owner's manual.
Q. Okay. So when you say that, I want to make sure I'm understanding. On the day you were there, you never got an owner's manual?

A. No.

Q. And you weren't there on the day that your dad picked it up; is that correct?

A. Yes, sir.

Q. And so you don't know if you had an owner's manual that day because you weren't there; is that true?

A. Yes, sir.

Q. Okay. But -- so you didn't get a warning manual; is that what you're telling me? At least on that date, November 2016, you didn't, you didn't get one, correct?

A. Yes, sir. I never remember seeing one.

Q. Okay. Fair enough. Let's talk about the other ones that you have, the other ATVs that you've used, the RZR and the Rhino and the MULE and the Kubota. Did you ever see any warnings, any type of guides or warning manuals?

A. I don't remember.

Q. Did you ever see any owner's manuals for any of those?

A. I don't remember, sir.

Q. Do you ever remember speaking with your father at any time regarding the use of a winch and how a winch should be used on the General?

A. Not on the General, but he's taught me like as growing up how to use it.

***

Q. Okay. And I want to make sure I understand your testimony. Is it your testimony that you did not see a tie strap at any time on the vehicle that you went and purchased with your father on November 26th of 2016?

A. Yes, sir.

***

Q. -- March 7th, 2017. On that date you and your friend….

A. Yes, sir.

Q. -- were out. I think you were returning a dog to a neighbor; is that accurate?

A. That's correct.

Q. And after you returned the dog to your neighbor, hopefully not driving through the front yard of your father's and mother's home, when you returned the dog, you saw that, as I believe you said, that something was messed up with the winch; is that right?

A. The winch just looked too close to the metal bars on there so I thought it

-3-

looked stuck a little bit.

Q. Had you ever noticed it looking stuck before?

A. No.

Q. Had you ever --

A. I hadn't really paid attention to it. It was just something like you just caught your eye when you were walking by it. I wasn't even planning on using it. I just thought I'd fix it.

\*\*\*

Q. Okay. So did you make sure that that's -- so you put your hand like that on the hook and the winch on that morning?

A. Yes.

Q. And that when your hand was like that -- it was your right hand -- right?

A. Correct.

Q. -- right? It was like that, right?

A. Yeah.

Q. So it was like that and you said press the out button?

A. Correct.

Q. And when you said that, then the winch pulled it in, correct?

A. Yeah. So it was kind of like that and then it pulled it in, got smashed off between those two bars. This thing went through there and smashed it off between the top.

\*\*\*

Q. November 20th of '18, this was taken during that inspection. I'll represent that to you, but have you ever seen that before?

A. No.

Q. Okay. And you don't recall seeing these warnings, correct?

A. Correct.

Q. Okay. Had you seen these warnings, would it have changed the way you handled things that day?

A. Probably not because I don't know what else I would have done.

Q. Okay.

A. I didn't -- we didn't have the book to read anyway on the blue, the blue picture.

Q. Oh, I see. So if you would have had that book, then you probably would have gone to that book and read it; is that right?

A. No, I probably wouldn't have gone to it, but I don't know what I could have done differently than what I did.

-4-

Barry Vaulton, Sam's father, also testified via deposition. One issue on appeal relates to whether a rubber stopper is a safety device and whether Polaris had a duty to install one on the General. Barry Vaulton testified, among other things, to his view that a rubber stopper—which the General lacked—is a safety device. He also testified to having never received safety instructions for the General or its winch:

Q. Okay. And if Ritchie Power Sports, someone from Ritchie Power Sports had given you instructions on the safe use of the winch, is it your testimony that you would have at least gone over that with Sam?
A. Yes. I would have -- let me say this. If I would have noticed that there hadn't been a tether on the machine, I would have never left the dealership without a tether because I felt like that would have been owed to us. All right? If I would have seen that machine, that hook in the condition that Sam saw it in, I would have made sure that -- I would have fixed it. Now, whether the tether had been on it or not, I would have probably got him a tether or made something. 'Cause I do realize how important that is. There just never was noticed that there wasn't a tether 'cause it had never been used.

***

Q. And you've testified under oath that the tether on the winch, there should always be a tether and that every, every winch that's in operation on your farm and your businesses or whatever has a tether on it?
A. That's correct.
Q. Correct? How many of the winches that are in operation on your farm or in your businesses or even at home have the winch stop dog on it?
A. Just about every one of them.
Q. They all have a winch stop dog?
A. Matter of fact, on our -- when Sam was trying to talk about the truck yesterday, it actually, whenever it touches the rollers, it disengages the winch.
Q. Okay.
A. So that way it's not -- it doesn't damage the winch. Let's just say.
Q. So is that something that you had to buy separately?
A. It came with the equipment.
Q. It comes with the equipment?
A. Uh-huh.
Q. Okay. And so can you describe for me what you mean again by a winch stop dog? I just want to make sure I understand it.
A. It's a protective device that's put between -- I guess you would call that the hook feral like where the cable goes around the feral. It goes between

-5-

the front of the -- or the back of the hook and keeps it from -- keeps this from going into the rollers.

***

Q. And I think you called it a winch stop dog, correct?
A. I think that's -- yes, I did.
Q. And so do you know what that -- and is it some of them are rubber stops, right?
A. That's correct.
Q. Do you know what it's designed for?
A. I would imagine it would be designed to keep the hook from going up into the rollers.
Q. If I told you that the rubber stop is designed to be like a shock absorber and to protect the rollers, would that, would you have any reason to dispute that?
A. No, sir.
Q. And if I told you that it would -- it's to hold the hook in place when the UTV is underway so the hook doesn't bounce around and damage parts, would you have any reason to dispute that?
A. No, sir.
Q. Have you done any research or work into that, to look in that --
A. No, I have not done --
Q. -- other than what we've talked about today?
A. I was -- I just assumed from previous experience, that's what it was for.

***

Q. Okay. Did you check your vehicle or check the packet that they gave, any packet that Ritchie Brothers gave you to see if you did receive the owner's manual?
A. My wife keeps very good records. She has everything in a file. And we pulled the file out and there was not anything. And that's the truth. So --

Ruben Pacleb ("Pacleb") assembled the General. Pacleb, a mechanic, worked for Ritchie from 2013 until 2019. Ritchie has since gone out of business. Pacleb testified to a possible cause of the accident; his disagreement with the Vaultons that safety instructions did not come with the General; and his view that a rubber stopper is not a safety device:

Q. What -- based on your, I guess, looking at the winch that day [of a post-accident inspection], what did you conclude about the winch?

-6-

A. The winch -- there's a possibility that the winch was not guided in properly. It went reverse on the spool and now the in is out and the out is in.
Q. And how does that occur?
A. If you don't keep constant pressure on it to guide the winch in, it can kink on itself. The cable can go backwards on itself and now it's reversed.
Q. So no matter what direction you push the button, it will go in rather than out?
A. Yeah.
Q. And that's because that's a function of the wire getting kinked?
A. Yes.

***

Q. You'll agree with me that you did not, when you saw the vehicle on November 2018 [on a post-accident inspection], it did not have a tether strap?
A. No tether strap.

***

Q. Did the General that's at issue, did it come to Ritchie Sports preassembled?
A. No.
Q. Did you partake or take part in the assembly of it?
A. Yes.
Q. So that is one of the jobs that you have. One of your duties as a mechanic is to assemble the vehicles when they were delivered?
A. Yes.
Q. Do you have a specific recollection of assembling this ATV, the General?
A. No.
Q. As we sit here today, can you tell me whether it came with a tether strap or not?
A. They all come with a tether strap.
Q. Do you recall that specifically with this one?
A. Every one that I've dealt with with the General when they first came out or pre-installed factory winches, other than the High Lifters, come with a tether strap.
Q. And do you recall putting this on?
A. It's already on from the factory.
Q. And you recall that specifically being the case with this General?
A. Yeah. I just look through the whole unit and make sure they have the proper equipment on it. And I haven't come across one that hasn't had one

that's supposed to have one.

Q. You agree they are supposed to have one?

A. Well, not -- well, it should have one.

Q. And that's a safety feature?

A. Yes.

Q. Yes?

A. Yes.

Q. Because you don't want people putting their fingers in the hooks.

A. Yes.

Q. And if there was no strap, that's what they're left to do?

A. Yeah.

Q. Is that correct?

A. Yes.

Q. If the Vaultons say there was no strap on this vehicle when they took possession of it, they would be wrong about that?

A. Yes.

Q. Okay. And if there wasn't one at the time of this accident, it means it either fell off or they took it off, in your mind, is that correct?

A. Yes.

***

Q. When you assemble the vehicle -- strike that. Does the -- when delivered, does the vehicle come with an owner's manual?

A. Yes.

Q. Okay. When you assemble it, what do you do with it?

A. It's in the glove box.

Q. And do you recall whether it was in the glove box in this case?

A. Yes.

Q. You have that specific recollection?

A. I specifically know that.

Q. Okay. Did it come with a safety DVD?

A. Yes.

Q. And where was that?

A. That was in the glove box.

Q. And if the Vaultons say that there was no owner's manual in the glove box, they would be wrong about that as well?

A. Yes.

Q. If they say there was no safe[t]y DVD, they would be wrong about that?

A. Yes.

-8-

***

Q. If you'll turn to page 55, is there reference, by the way, in this winch guide to what you -- what you found as to the kinking in this winch and if it's kinked a certain way, it's going to go in regardless of whether you push out or in. Is there any reference to that in here?

A. I will have to read through the whole thing.

Q. Okay. Go ahead.

MR. SNYDER: And I'll note my objection. No foundation. Lack of foundation for this witness. Calls for speculation.

THE WITNESS: No. It doesn't say anything about its reverse spooling, which occurs a lot.

BY MR. CAIN:

Q. And that's something that can cause some injuries, can't it?

A. Yes. It happened to me three times on my unit.

***

Q. So at some point after it left -- left your hands where it had a hook and a tether strap, from the time it was delivered to the Vaultons to that date, at some point in time the tether strap was removed, is that accurate?

MR. CAIN: Object to the form.

THE WITNESS: Correct.

***

Q. Okay. Thank you. Now, you were asked a couple questions by Mr. Cain regarding the winch cable, right?

A. Correct.

Q. Do you remember seeing a kinked or some deformities or whatever in the winch, in the winch cable on the date you were out there?

A. Yes.

Q. Is it possible that those winch deformities -- we'll call them kinks for purposes of today -- could have happened without that winch ever being used, ever?

A. Impossible.

Q. Okay. So, if someone said that this was the very first time that the winch was used, they would be mistaken?

A. Correct.

Q. That's because it's impossible for those kinks to be in there as demonstrated if it had never been used before, is that accurate?

-9-

MR. CAIN: Object to the form.

THE WITNESS: Correct.

BY MR. SNYDER:

Q. Okay. You discussed in response to Mr. Cain's questions about these, the rubber stopper, and I think you said that if there's a synthetic line or some -- maybe it wasn't synthetic, if it was a different type of cable, you might have a stopper on it, correct?

A. Correct.

Q. What kind of a winch cable was on the General?

A. Steel cable.

Q. Would a steel cable have the type of stopper that you were provided earlier today? I think it was 14 or 15. Would those have those type of a stopper on it?

A. On cables, no.

Q. And why is that, sir?

A. Because the cables don't stretch and the cable cuts that stopper.

Q. Okay. And do you even know why stoppers are put on winches? Do you have any firsthand knowledge, sir, of why companies would do that?

A. To keep the rattle down from the hook.

Q. Okay. So, it's not for safety purposes, it's to keep the rattle down from the hook rattling back and forth as the vehicle is being operated, is that accurate?

A. Correct.

***

Q. So there was a period of time from the time where you had completed your work and the time they picked it up, and you don't know what happened to the vehicle during that time, is that correct?

A. Correct.

Q. So you don't know whether somebody took the tether off then or whether it fell off before then, correct?

A. Correct.

Q. So it's possible that it was not there when they received it, correct?

A. Correct.

Q. And it's possible, also, that the owner's manual and the DVD weren't present, correct?

MR. SNYDER: Objection. Speculation.

THE WITNESS: That was there.

MR. SNYDER: Contrary to the witness' testimony.

BY MR. CAIN:

Q. You know for a fact what?

A. That thing was there when we did the inspection. When we did the inspection in November, it was in there.

Q. I'm talking about November 2018. But I'm asking about the time when they took delivery of it, correct, you don't know?

A. Yeah. I don't know.

Laci Coker-Lavan ("Coker-Lavan"), a salesperson at Ritchie from 2011 through 2019, also was deposed. Coker-Lavan sold the General to the Vaultons, but she could not specifically remember any discussions she had with them about it. Coker-Lavan stated, in part:

Q. Okay. So, as far as whether there was a tether strap on the hook, you don't know whether there was?

A. No.

Q. Okay. You don't know whether there was an owner's manual in the glove box, do you?

A. No.

Q. You don't know whether there was a DVD in the glove box?

A. No.

Q. You don't know whether there was ever a DVD in the glove box?

A. No.

Q. You don't know that there was ever an owner's manual in the glove box?

A. Not for a fact.

Q. Okay. You don't know whether there was ever a tether strap on the hook to the winch, correct?

A. Correct.

Q. Okay. You do know that the winch did not come with a safety stop, correct?

A. Correct.

Q. All right.

MR. SNYDER: Objection.

BY MR. CAIN:

Q. Do you know what a safety stop is?

A. Is it the rubber piece that goes behind the hook?

Q. Yes.

A. Yes.

Q. Do you know what those are?

A. Yes.

Q. How do you know what they are?

A. Because I've sold winches.

-11-

Q. And it's a fairly common thing with winches, correct?

A. Yes.

Q. Does it come with certain type of winches only?

A. Yes. I believe that's correct.

Q. What type of winches does it come with?

A. With the Polaris, like, they're PRO HD models, I believe have the actual safety -- the auto stop technology on those.

Q. Okay. That's a safety feature?

A. Yes.

Q. All right.

MR. SNYDER: Objection. Calls for speculation.

BY MR. CAIN:

Q. And what safety is it providing?

MR. SNYDER: Objection. Calls for speculation.

BY MR. CAIN:

Q. Go ahead.

A. What safety is it providing?

Q. Yes.

A. Not rolling the hook too far into the winch.

Q. Keeping your finger out of there, correct?

A. Fingers, hooks.

MR. SNYDER: Objection. Calls for speculation.

BY MR. CAIN:

Q. Is that correct?

A. Yes.

Q. Okay. And what type of vehicle did you say it came on, the Polaris what?

A. The winch itself with the auto stop, I think is the PRO HD winch model.

Q. Is that an ATV?

A. No, that's the winch itself.

Q. Okay. What does it come on? Does it come on any vehicles?

A. I don't believe it's factory installed in Polaris models.

Q. So it's an add-on?

A. Yes. It's a specific winch.

Q. And is it something that the customer has to request?

A. Yes. It's an accessory.

Q. Okay. It doesn't come from the manufacturer as stock on part of any vehicle, is that correct?

A. I don't believe so.

***

Q. You'll agree with me that everything above the Delivery to Customer box was completed by Ruben?

A. Yes.

Q. Let's talk about the Delivery to Customer box there. There is nothing checked there, correct?

A. Correct.

Q. On the right, it has dealership name. That's blank, right?

A. Yes.

Q. And then dealer number, that's blank?

A. Yes.

Q. Selling dealer, signature is blank?

A. Yes.

Q. And the date is blank?

A. Yes.

Q. Is that typically filled out?

A. Supposed to be.

Q. Okay. Who's supposed to fill that out?

A. The salesperson.

Q. You, in this case?

A. Yes.

Q. Do you know why it wasn't filled out in this case?

A. No.

Q. All right. Is it because these things weren't done? You don't know?

A. I don't know.

Q. But if you had done these things, you would have checked it off and signed, right?

A. Yes.

Q. Because you didn't do that, we can assume it wasn't done?

A. Generally, when I deliver a machine to the customer, I do go over all this and I have not always had the customer sign.

Q. Well, I'm talking about the part that you sign. You didn't sign this, correct?

A. Correct.

Q. All right. And because of that, can we infer that you didn't do those things with the customer here?

A. If I -- if the customer was -- if I did the delivery with the customer, I would have gone over these things.

Q. And you would have signed it?

A. I did not always sign these, no.

Q. You would have gotten the customer to sign it?

A. I did not always get the customer to sign them.

-13-

Q. Are you saying that you went over these things with the Vaultons?
A. I don't know.

In April 2021, the Trial Court heard Defendants' motions for summary judgment. The same month, the Trial Court entered an order granting summary judgment in favor of Defendants. In its order, the Trial Court stated, in relevant part:

> As it pertains to Ritchie Power Sports, LLC's Motion for Summary Judgment, Ritchie Power Sports submits that Plaintiffs' claims do not fall under any statutory exception under T.C.A. § 29-28-102 through 106 whereby a seller may be held liable in a product liability action. Plaintiffs argue that Ritchie Power Sports was negligent in failing to provide the 2017 Polaris General 1000 to the Plaintiffs equipped with a tether strap on the winch hook. Additionally, Plaintiffs argue that Ritchie Power Sports negligently failed to provide a user manual or safety instructions to Plaintiffs at the time of the purchase.
>
> This Court finds, in a light most favorable to the non-moving party (Plaintiffs), that a tether strap was in place on the 2017 Polaris General 1000 at the time of delivery to Ritchie Power Sports and remained on the equipment until it was purchased by Plaintiff Barry Vaulton. Further, this Court finds that there was no alteration or modification as to the owner's manual and that it was where it was supposed to be when Plaintiffs took possession of the 2017 Polaris General 1000. Being that there are no issues before the Court where Ritchie Power Sports can be held liable, this Court finds its Motion for Summary Judgment is well-taken and therefore must be GRANTED.
>
> Polaris Industries, Inc. likewise relies on the law governed by T.C.A. § 29-28-101 through 108 as it pertains to the manufacturer's liability for negligence and Plaintiffs' requirement to show that the winch system of the 2017 Polaris General 1000 was in either in a "defective condition" or "unreasonably dangerous" at the time it left Polaris's control. Plaintiffs argue that the winch was defective and/or unreasonably dangerous because it lacked a rubber stopper and because it had the ability to "reverse spool," and, in this instance, did "reverse spool."
>
> Viewing the evidence in the light most favorable to the non-moving party (Plaintiffs), this Court finds that there are no genuine issues of material fact regarding either of Plaintiffs' defect theories. Regarding the rubber stopper, this Court finds that Polaris did not have a duty to install a rubber stopper as a safety device on the type of winch at issue in this litigation. Regarding Plaintiffs' "reverse spooling" defect theory, this Court finds that, notwithstanding Polaris's spoliation argument, there is no evidence in the

record that the winch cable was "mis-spooled" or "reverse spooled." Plaintiffs have not presented record evidence that would support a verdict on a "reverse spooling" defect theory and therefore have failed to demonstrate they are entitled to a jury trial on such issue.

Even when construing the evidence in a light most favorable to the Plaintiffs, the Court finds there are no genuine issues of material fact supporting any of Plaintiffs' theories of recovery against Polaris. Therefore, Polaris Industries Inc's Motion for Summary Judgment is well-taken and shall be GRANTED.

It is therefore **ORDERED**, **ADJUDGED** and **DECREED** that there are no genuine issues of material fact to support any theory of recovery for Plaintiffs and the Defendants, Ritchie Power Sports, LLC and Polaris Industries, Inc.'s, Motions for Summary Judgment are hereby granted, and this matter shall hereby be dismissed with prejudice. All court costs associated with this matter shall be taxed to Plaintiffs.

Plaintiffs timely appealed to this Court. However, Plaintiffs had an outstanding request for attorney's fees and expenses, which the Trial Court had taken under advisement. Consequently, this Court entered a show cause order concerning the finality of the judgment below. Plaintiffs voluntarily withdrew their request for attorney's fees and expenses, and the Trial Court entered an order reflecting that the issue of Plaintiffs' attorney's fees and expenses was moot.

## Discussion

Although not stated exactly as such, Plaintiffs raise the following issues on appeal: 1) whether the Trial Court, as part of its grant of summary judgment in Ritchie's favor, erred in determining there was no genuine issue of material fact as to whether the winch-hook came with a tether attached; 2) whether the Trial Court, as part of its grant of summary judgment in Ritchie's favor, erred in determining there was no genuine issue of material fact as to whether Ritchie failed to provide Plaintiffs with an owner's manual or safety instructions; 3) whether the Trial Court, as part of its grant of summary judgment in Polaris' favor, erred in determining there was no genuine issue of material fact as to whether the General's winch reverse-spooled; and 4) whether the Trial Court, as part of its grant of summary judgment in Polaris' favor, erred in finding Polaris had no duty to attach a rubber stopper to the otherwise defective or unreasonably dangerous winch.

Regarding the standard of review on motions for summary judgment, our Supreme Court has instructed:

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare– Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

\*\*\*

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the

-16-

nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC,* 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

We first address whether the Trial Court, as part of its grant of summary judgment in Ritchie's favor, erred in determining there was no genuine issue of material fact as to whether the winch-hook came with a tether attached. Ritchie argues that, as a "Seller" under Tenn. Code Ann. § 29-28-102(7), Plaintiffs' products liability claim against it cannot survive unless it alleges and proves one of five statutory exceptions under Tenn. Code Ann. § 29-28-106. The exception pertinent to this appeal is the second statutory exception, whereby a Seller alters or modifies a product and the alteration or modification was a substantial factor in causing the harm for which the recovery of damages is sought. Tenn. Code Ann. § 29-28-106(2). Ritchie asserts no alterations or modifications were made to the winch as it was pre-installed. Ritchie argues further that Plaintiffs failed to make out a claim for ordinary negligence against it. In their reply brief, Plaintiffs respond as follows: "There can be no dispute that the crux of this issue is whether a tether-strap was in place on the winch at the time of delivery to Ritchie and remained there until it was purchased by the Plaintiffs. If Ritchie detached the tether … it would be an alteration or modification of the winch…." Plaintiffs argue the second exception of Tenn. Code Ann. § 29-28-106 applies because Ritchie's alleged removal of the tether-strap from the winch-hook constitutes an alteration or modification of the winch and was a substantial factor in causing Sam Vaulton to lose his right index finger. Plaintiffs also contend that Ritchie is mistaken in characterizing Plaintiffs' claim against it as being brought only under the TPLA; Plaintiffs point out that they asserted claims for negligence, breach of warranty, and strict liability against both Defendants.

Plaintiffs cite the following evidence in support of their contention that there is a genuine issue of material fact for a jury to resolve with respect to whether the winch came with a tether and whether a tether was in place on the winch-hook when the General was delivered to Plaintiffs: Plaintiffs never saw a tether strap on the winch; Sam Vaulton testified no tether strap was attached to the winch; the Vaultons did not use the winch until

-17-

the day of the accident; Pacleb testified he did not know whether the tether had fallen off or had been taken off the winch before Plaintiffs took delivery of the General; Coker-Lavan testified she could not say whether the General came with a tether-strap attached to the winch-hook; and during a November 2018 inspection of the General, it was discovered that no tether strap was attached to the winch-hook. Against this, Ritchie argues that the inferences drawn from the testimony support only one conclusion—that a tether strap was, indeed, attached to the winch when it left the seller. Ritchie points to Pacleb's testimony that he has never come across a Polaris General model that did not have a tether strap. Ritchie also points to Barry Vaulton's testimony that he would have not left the dealership if he noticed the winch lacked a tether strap.

If inferences were drawn in Ritchie's favor, the evidence Ritchie cites to would tend to support its position that a tether strap was in place on the General's winch when it left the seller. However, this case was disposed of by summary judgment, and inferences are to be drawn in favor of Plaintiffs as the non-moving parties. Plaintiffs' testimony that they never saw a tether strap attached to the General, that this was the first time the winch was used, and that a post-accident inspection revealed no tether strap, all support an inference that a tether strap was not attached to the winch-hook when it left the seller, which in turn supports Plaintiffs' theory that Ritchie modified or altered the General. Meanwhile, although Pacleb testified he never encountered a Polaris General Model without a tether strap on its winch, he could not state specifically that the General at issue had a tether strap when it was delivered to Plaintiffs. We do not weigh evidence at the summary judgment stage. A genuine issue of material fact thus exists as to whether the General's winch came to Ritchie with a tether attached and whether there was a tether attached at the time of delivery to Plaintiffs. We, therefore, reverse the Trial Court as to this issue.

We next address whether the Trial Court, as part of its grant of summary judgment in Ritchie's favor, erred in determining there was no genuine issue of material fact as to whether Ritchie failed to provide Plaintiffs with an owner's manual or safety instructions. Plaintiffs point to deposition testimony by Barry and Sam Vaulton to the effect they never received an owner's manual or safety instructions. Ritchie argues in turn that the affidavits and deposition testimony reveal there was an owner's manual and a safety DVD in the General's glove box. Ritchie argues further that, even if it did not provide Plaintiffs with these materials, Plaintiffs failed to show that such a failure would amount to an alteration or modification that was a substantial factor in causing the harm to Plaintiffs.

Resolution of this issue requires a careful examination of the evidence. In their response to Ritchie's Statement of Undisputed Material Facts, Plaintiffs stated:

5. Ruben Pacleb located the owner's manual in the glove compartment of the Polaris General at the post-accident inspection in November 2018. (Depo of Ruben Pacleb p. 138, lines 2 — 12.

**RESPONSE: <u>Disputed.</u>** Mr. Pacleb admittedly does not know whether the owner's manual was with the General at the time the Vaultons took delivery. *Ruben Pacleb Deposition, p. 138.* Further, the Pre-Delivery Inspection Form associated with the Vaultons' purchase of the General does not reflect that they were provided an owner's manual and each of the Vaulton Plaintiffs deny receiving an owner's manual. *Plaintiffs' SAMF, ¶¶ 16 and 46-49, **Exhibit A** thereto.* Finally, Mr. Pacleb claims he (and that Polaris' lawyers and a Polaris tech) took photographs/video of the owner's manual in the glove box in November of 2018 at the inspection of the General. *Plaintiffs' SAMF, ¶¶ 33-39.* Mr. Pacleb claims he deleted these photographs and, to date, not a single photograph or video has been produced depicting what Mr. Pacleb claims was documented by any number of people. *Plaintiffs' SAMF, ¶¶ 33-39.*

For their part, Plaintiffs assert the following evidence in support of their contention that a genuine issue of material fact exists concerning whether they received any safety instructions: the Vaultons testified they never received an owner's manual; Pacleb conceded he did not know whether the owner's manual was with the General when the Vaultons took delivery; Coker-Lavan testified she could not say whether or not the General came with an owner's manual; Ritchie's own "Pre-Delivery Inspection Form" for the General indicated Ritchie did not provide the Vaultons with an owner's manual; there were no warnings or labels on the winch according to Sam Vaulton; the Vaultons did not remove any warnings off the General; Ritchie did not give the Vaultons any safety instructions; nobody at Ritchie instructed the Vaultons on how to use the winch properly; and finally, according to Ritchie's "Pre-Delivery Inspection Form" for the General, Ritchie did not review the General's safety features with the Vaultons or perform a pre-delivery inspection as otherwise Coker-Lavan would have checked the corresponding boxes on the form and signed it.

For its part, Ritchie cites Pacleb's testimony that he specifically knows that the owner's manual was in the General's glove box; that, per affidavits, Staff Field Investigator Thomas Lancaster attended the inspection on November 20, 2018 and observed a 2017 Polaris General 1000 Owner's Manual and a Polaris Safety DVD in the glove box; that Polaris retained Todd Walstrom to examine the 2017 Polaris General on July 23, 2019 and he observed a 2017 Polaris General 1000 Owner's Manual and a Polaris Safety DVD in the glove box; that Plaintiffs retained Paige Pendleton to film an inspection of the 2017 Polaris General on July 23, 2019 and she, too, observed an owner's manual and a Polaris

Safety DVD in the glove box. Ritchie argues further that the blank "Delivery to Customer" section of the "Pre-Delivery Inspection" is not proof of anything. Ritchie observes that Plaintiffs are not arguing, for example, that they did not receive the keys to the General just because that portion of the inspection was left blank.

In their brief, Plaintiffs strenuously assert that "whether Plaintiffs were provided with an owner's manual, much less safety instructions on how to operate the winch, is very much disputed." (Emphasis in original). However, this record contains no evidence reflecting a dispute. While the Vaultons testified they never received an owner's manual or safety instructions, the post-accident inspection shows the owner's manual and safety DVD were located in the General's glove box in Plaintiffs' possession. As we stated in our discussion of the previous issue, we do not weigh the evidence at the summary judgment stage. However, if there is no genuine issue of material fact in dispute, there is nothing to weigh as there is no conflict. This is so even if a non-moving party conclusorily asserts a material dispute exists but fails to point to evidence of such a dispute in the record. None of the evidence Plaintiffs cite to in the record conflicts with the evidence showing that the owner's manual and safety DVD were located in the General's glove box in Plaintiffs' possession. Instead, Plaintiffs simply point out that the inspection took place some 20 months after the incident. Nevertheless, Plaintiffs cite no evidence showing that the safety instructions were, for example, planted in the General after the incident. Plaintiffs' generic assertions that they did not receive the items do not create a genuine issue of material fact. Plaintiffs' mere stated non-receipt of an owner's manual and safety instructions is not the dispositive question—if, as the undisputed evidence reflects, the owner's manual and safety instructions were located in the General's glove box in Plaintiffs' possession, these safety instructions were at Plaintiffs' disposal whether they chose to avail themselves of them or not. Plaintiffs did not testify, for instance, that "we looked in the glove box and did not see an owner's manual or any safety instructions."

In order to benefit from a favorable inference as the non-moving parties at the summary judgment stage, Plaintiffs still must point to evidence in the record supporting that inference. Likewise, Plaintiffs may not rest on the mere possibility that a jury would not credit undisputed evidence of the location of the safety materials. If all a non-moving party needed to do to withstand summary judgment was point to the possibility that a jury might not credit an affiant's statement or a deponent's testimony, summary judgment under Tenn. R. Civ. P. 56 would be rendered hollow. Plaintiffs point to no facts in the record contradicting that the owner's manual and safety DVD were located in the General's glove box. Barring any such evidence, we are left solely with the evidence showing that the owner's manual and safety DVD were located in the General's glove box. No genuine issue of material fact requiring resolution by the jury exists regarding the owner's manual and safety DVD; the undisputed evidence shows the owner's manual and safety DVD were

located in the General's glove box in Plaintiffs' possession. We affirm the Trial Court on this issue.

We next address whether the Trial Court, as part of its grant of summary judgment in Polaris' favor, erred in determining there was no genuine issue of material fact as to whether the General's winch reverse-spooled. Plaintiffs argue that the Trial Court "failed to accept as true Plaintiffs' evidence indicating that not only had the General's winch-cable reverse-spooled on Sam Vaulton, but that Ritchie mechanic Pacleb, who assembled the General, and at least one Polaris employee, had actually experienced similar reverse-spooling." Plaintiffs cite the "consumer expectation test," which our Supreme Court has described as an assessment of "whether the product's condition poses a danger beyond that expected by an ordinary consumer with reasonable knowledge….[p]ut another way, under this test, a product is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury." *Tatham v. Bridgestone Americas Holding, Inc.*, 473 S.W.3d 734, 750 (Tenn. 2015) (internal brackets, citations, and quotation marks omitted). Plaintiffs argue that the General's winch was defective or unreasonably dangerous. In response, Polaris argues that there is no evidence in the record that any defect existed in the winch at the time it left Polaris' control that could have caused it to reverse-spool at the time of Sam Vaulton's accident. Polaris dismisses Pacleb's testimony as "speculative."

We disagree with Polaris that Pacleb's testimony was just "speculative." Pacleb testified specifically to his own experiences with reverse-spooling. In so doing, he articulated a possible explanation for what caused Sam Vaulton's accident. At oral arguments, counsel for Polaris argued that the evidence in the record as to reverse-spooling proves that the winch must have been used by Plaintiffs or a third party prior to Sam Vaulton's accident. However, Sam Vaulton testified specifically that the winch had never been used before the accident. Thus, there is evidence in the record to support that Sam Vaulton's accident could have been caused by the General's winch being reverse-spooled and that the winch had never been used before the accident. Polaris' theory that someone else used the winch before Sam Vaulton's accident, despite Plaintiffs' unequivocal testimony to the contrary, is one to be made to a jury and not one amenable to resolution at the summary judgment stage.

At the heart of this litigation is the evidence that when Sam Vaulton instructed his friend to press the "out" button, the cable went in. At a minimum, this discrepancy whereby pushing the "out" button caused the cable to go in suggests a problem with the General's winch. We take no position on whether the General's winch was defective or unreasonably dangerous when it left Polaris' control or whether either side can substantiate their respective theories as to what happened. We do hold, however, that there is a genuine issue of material fact precluding summary judgment. We reverse the Trial Court on this issue.

The final issue we address is whether the Trial Court, as part of its grant of summary judgment in Polaris' favor, erred in finding Polaris had no duty to attach a rubber stopper to the otherwise defective or unreasonably dangerous winch. Plaintiffs argue that the Trial Court "failed to engage in a proper analysis of whether Polaris owed a duty and Polaris had provided no proof to suggest that the injury to Sam Vaulton was unforeseeable, or as to either the gravity of harm or its burden to engage in alternative conduct." In response, Polaris argues: "The record evidence demonstrates plainly that a rubber stopper is *not* designed as a protective device to prevent a user's fingers from being injured when the user is improperly holding onto the winch hook, contrary to the winch's safety warnings." (Emphasis in original). Polaris points instead to Pacleb's deposition testimony that that the purpose of a "stopper" is to keep the winch hook from rattling loosely against the winch. Polaris argues further that Barry Vaulton's testimony that a rubber stopper is a safety device is inadmissible lay opinion testimony that cannot create a genuine issue of material fact. In response, Plaintiffs contend the evidence shows Barry Vaulton had practical experience with ATVs and winches and knew of the subject he was speaking about. Plaintiffs points out further that Polaris ignores the testimony of the Ritchie sales representative, Coker-Lavan, in which she agreed that a rubber stopper is a safety device.

"Whether the defendant owed the plaintiffs a duty of care is a question of law to be determined by the court." *West v. East Tennessee Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005) (internal citations omitted). Our Supreme Court has articulated the following test for determining whether a duty exists:

When the existence of a particular duty is not a given or when the rules of the established precedents are not readily applicable, courts will turn to public policy for guidance. Doing so necessarily favors imposing a duty of reasonable care where a defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property. When conducting this analysis, the courts have considered, among other factors: (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct.

With these factors firmly in mind, Tennessee's courts use a balancing approach to determine whether the particular risk should give rise to a duty of reasonable care. A duty arises when the degree of foreseeability of the risk and the gravity of the harm outweigh the burden that would be imposed

if the defendant were required to engage in an alternative course of conduct that would have prevented the harm. The foreseeability and gravity of the harm are linked insofar as the degree of foreseeability needed to establish a duty is inversely proportional to the magnitude of the foreseeable harm. The greater the risk of harm, the less degree of foreseeability is required. During the balancing process, it is permissible for the courts to consider the contemporary values of Tennessee's citizens.

*Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 365-66 (Tenn. 2008) (internal citations, quotation marks, and footnote omitted). However, our Supreme Court also stated: "The *Satterfield* analysis is inapplicable to the particular question presented in this case because, as this Court explained in *Satterfield*, the foreseeability test it articulated does not apply if 'prior court decisions and statutes have already established the doctrines and rules governing a defendant's conduct.'" *Coffman v. Armstrong International, Inc.*, 615 S.W.3d 888, 899 (Tenn. 2021) (quoting *Satterfield*, 266 S.W.3d at 365)). Here, the Trial Court held "that Polaris did not have a duty to install a rubber stopper as a safety device on the type of winch at issue in this litigation."

While the Trial Court, and the parties to varying degrees, couch this issue in terms of whether a duty existed, it appears that this issue in fact concerns whether a duty was breached. This is a products liability case, at least in part, and Polaris' duties with respect to not putting defective or unreasonably dangerous products on the market is established by statute. Whether a rubber stopper is a safety device; whether a rubber stopper would have prevented Sam Vaulton's accident; and whether Polaris should have installed a rubber stopper on the General's winch, all implicate factual matters in dispute. At the summary judgment stage, we do not weigh the evidence, nor do we engage in credibility determinations regarding the deponents. The testimony of Barry Vaulton and Coker-Lavan that a rubber stopper is a safety device stands in conflict with Pacleb's testimony that a rubber stopper is not a safety device. Summary judgment is not the appropriate stage at which to resolve this dispute. It is for the jury to decide. We, therefore, reverse the Trial Court on this issue.

In conclusion, we affirm the Trial Court's determination that Ritchie is entitled to summary judgment with respect to Plaintiffs' claim that they did not receive an owner's manual or safety instructions. Plaintiffs failed to point to any evidence in the record disputing the evidence showing specifically that the owner's manual and safety DVD were located in the General's glove box in their possession. However, we reverse the Trial Court on the other three issues presented. Therefore, we reverse the Trial Court's grant of summary judgment to Defendants, and remand for further proceedings consistent with this Opinion.

-23-

## Conclusion

The judgment of the Trial Court is affirmed, in part, and reversed, in part. This cause is remanded to the Trial Court for collection of the costs below and for further proceedings consistent with this Opinion. The costs on appeal are assessed one-half against the Appellee, Polaris Industries, Inc., and one-half against the Appellee, Ritchie Power Sports, LLC.

_____
D. MICHAEL SWINEY, CHIEF JUDGE